# EXHIBIT 1



# World Boxing Council

Home | Merchandise | Links | Contact Us

**Press Releases**

- Ratings
- Latest Results
- Boxing Season
- Current Champions
- Press Releases
- Sulaiman´s Tribune
- WBC FEMALE
- WBC INTERNATIONAL CHAMPIONSHIP
- WBC FANS: LETTERS AND PICTURES

- Welcome by the President
- Organization Chart
- History & Founding Fathers
- Constitution, Rules and Regulations
- Accomplishments that have Changed the World of Boxing
- Convention Sites
- Hall of Fame
- Championship Fights Statistics

- Brister´s newsletter
- Photo Gallery
- Downloads

search ▶

## This December 20:
## RAHMAN WILL RECEIVE HIS BELT IN CANCUN

On December 20 in the paradisiacal Cancun, the World Boxing Council will present Hasim Rahman with the championship belt as the undisputed world heavyweight champion of the WBC, after Vitali Klitschko's retirement due to an injury he suffered a week before their title bout.

At the same time, the WBC has designated Vitali Klitschko as World WBC Champion Emeritus in recognition of his unquestionable loyalty and his transparent extraordinary boxing career; also for having brought great prestige and honor to the heavyweight division and for possessing a record of 35-2-0 with an incredible percentage of 97.1 in victories by KO.

The WBC World Champion Emeritus automatically becomes the Ambassador for Peace and Good Will in the World through sports.

With this nomination Vitali Klitschko will also keep the right to return to the boxing arenas as immediate mandatory official challenger if someday he would wish to come back to professional boxing, instead of retiring definitively.

Other very special guests will be present at the ceremony on December 20; their names will be disclosed once their attendance is confirmed.

top ▲

WBC online advertising info:

advertising@wbcboxing.com

WBC FEMALE

INTERNATIONAL CHAMPIONSHIP

CLETO REYES



• All rights reserved. World Boxing Council • Comments? Questions? • Advertiser info •
•World Boxing Council Cuzco 872, Colonia Lindavista 07300 Mexico, D. F. MEXICO• 52(55) 5119-5276•
info@wbcboxing.com • Experience by    aeris

# EXHIBIT 2

## MARK A. KIRKORSKY, P.C.
### Attorneys at Law
4025 South McClintock Drive, Suite 208
Tempe, Arizona 85282
(480) 603-4088
Facsimile (480) 603-4093

Mark A. Kirkorsky
Admitted in Arizona
and California
mark@maklaw.net

February 1, 2007

**Via email gpenagaricano@wbcboxing.com**
Gabriel A. Penagaricano, Esq.
WBC Secretary General

**Via email attylen@yahoo.com**
Robert J.B. Lenhardt, Esq.
WBC General Counsel

**Via email sulijos@gmail.com suljos@gmail**
Mr. Jose Sulaiman
WBC President

  Re:  Compulsory Mediation and Arbitration

Gentlemen:

  In compliance with the Order issued by the WBC on January 31, 2007 pursuant to Rule 5.3 of the Rules and Regulations of the WBC, my clients confirmed in writing their intention to participate in the **compulsory** mediation process prior to the close of business on January 31, 2007. In two separate communications we requested verification that all parties to the mandated mediation had likewise complied with the Order of the WBC. As of this time, I have yet to receive such confirmation which is disconcerting as it would tend to indicate that all parties have not so responded.

  A failure to comply with a direct Order issued by the WBC, and a failure to participate in good faith in the mediation process, as **mandated** by Rules 5.3 and 5.3(f), is a direct violation of the Rules and Regulations. The Rules and Regulations mandate a step-by-step process. A condition precedent to compulsory mediation under Rule 5.3, is the administrative review process set forth in Rule 5.2, which was completed by the WBC as set forth in its January 31, 2007 letter to the parties. Likewise, a condition precedent to the mandatory arbitration process under Rule 5.4, is good faith participation in the compulsory mediation process required by Rule 5.3. The words **"compulsory"** and **"mandatory"** have meaning here. These are not voluntary processes, but rather are necessary components of the progression.

February 1, 2007
Page 2

It has come to our attention that Mr. Klitschko and his representatives did, in fact, comply with the WBC's Order and did provide written confirmation of their intention to participate in the mediation in good faith. In the event that Mr. Peter and his representatives have failed to so comply, then it is our position that the WBC must hold them in violation of the Rules and Regulations of the WBC and further must hold them in contempt of the WBC's clear Order of January 31, 2007.

It should be emphasized that pursuant to Rules 5.1 and 5.5, these Rules and Regulations clearly and unequivocally provide the **exclusive remedies** to "any boxer, promoter, manager, or other person or organization that participates in the activities or events of the WBC, or who avail themselves, or claim any right arising on the WBC Constitution or these Rules and Regulations."

The bottom line is clearly that no party to this matter has the right or option to side-step or violate these Rules and Regulations. As such, in the event that the WBC did not receive written confirmation from Mr. Peter and/or his representatives of their intention to participate **in good faith** in the **compulsory** mediation by the mandated deadline, then they must necessarily be held in violation of the Rules and Regulations and the Order of the WBC. If the Rules and Regulations of the WBC are not going to be enforced, then what is the point of having them. Moreover, a failure to enforce the Rules and Regulations sets a dangerous precedent.

In such instance and based upon the premise that no written confirmation was received, my clients believe it is incumbent upon the WBC to redress any such violation as follows:

1.     The WBC should declare Mr. Peter in violation of Rule 5.3 and Rule 5.3(f), thereby forfeiting his right to proceed under Rule 5.4, as a result of his failure to satisfy the condition precedent set forth in Rule 5.3;

2.     The WBC should drop Mr. Peter from its rankings as a result of his refusal to abide by its Rules and Regulations; and

3.     The WBC should immediately sanction a championship title bout between Oleg Maskaev and Vitali Klitschko.

I look forward to your timely response.

Very truly yours,
MARK A. KIRKORSKY, P.C.

*Mark Kirkorsky*

Mark Kirkorsky

cc:     Dennis Rappaport Productions, Ltd.
        Mr. Oleg Maskaev
        Mr. Fred Kesch

# EXHIBIT 3

74JUMASC                                                    1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OLEG MASKAEV and DENNIS
RAPPAPORT PRODUCTIONS, LTD.,

                Plaintiffs,

        v.                              07 CV 3147(DAB)

WORLD BOXING COUNCIL and
SAMUEL PETER,

                Defendants.

------------------------------x

                                    New York, N.Y.
                                    April 19, 2007
                                    2:50 p.m.
Before:

                HON. DEBORAH A. BATTS

                                    District Judge

                        APPEARANCES

PROFETA & EISENSTEIN
        Attorneys for Plaintiffs
BY:  JETHRO M. EISENSTEIN

ROBERT LENHARDT (Via Telephone)
        Attorney for Defendant World Boxing Council

KRAMER LEVIN NAFTALIS & FRANKEL LLP
        Attorneys for Defendant Samuel Peter
BY:  JEREMY A. COHEN

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

74JUMASC                                                          2

1              (Case called)

2              THE COURT:  The Court has had an opportunity to review

3       briefly the papers submitted by the plaintiff, so I imagine

4       that the first thing I should do is give the defendants an

5       opportunity to say what they would like to.

6              Would it be appropriate for Mr. Lenhardt to go first

7       or Mr. Cohen?

8              MR. COHEN:  I am happy to start.

9              THE COURT:  Mr. Cohen is going first.

10             MR. COHEN:  There are really a couple of points that

11      dispose of this, the TRO.  Maybe this does make it out of

12      order.  Mr. Lenhardt is prepared to speak about the

13      administrative remedies at issue which the deputy has raised in

14      our phone call.

15             In addition, there is a real serious question of

16      delay.  This is truly an eleventh hour motion.  The purse bid

17      is supposed to take place tomorrow.  It is something that

18      plaintiffs were aware of as early as April 9, which is over a

19      week ago.  They wait until today, when the purse bid is

20      supposed to take place tomorrow in Mexico City and people have

21      made plans to get down there.  This is an eleventh hour filing.

22      They could have made the motion seven days ago.

23             In any event, on the law, on the merits of the

24      application for a TRO, as your Honor is I'm sure aware, the

25      standards are the same for a TRO or a preliminary injunction --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

3

74JUMASC

1    show irreparable harm, likelihood of success or, in the

2    alternative, serious questions to the merits or some sort of

3    showing of hardship.

4            There is no irreparable harm.  This is a money

5    dispute.  They're concerned about the division of proceeds from

6    a purse offer.  The offer is going to be what it is, some

7    number, and it is going to be divided amongst the boxers

8    according to a percentage set by the WBC under the WBC rules.

9    So whether that takes place or not, it is still a question of

10   how the proceeds would be divided.  So a bid could come in,

11   say, for example, a million dollars.  As it currently stands,

12   55 percent goes to Mr. Maskaev and 45 percent to Mr. Peter.  If

13   they want to pursue their claim, they can still do it.  And all

14   that is going to change is the percentages -- 30 percent would

15   then go to my client, 70 percent to Mr. Maskaev.  So it is just

16   a money issue.  There is no irreparable harm.

17           As to the merits, the WBC rules govern the purse bid

18   and I know that they are attached to the exhibit and I have a

19   copy if your Honor would like.

20           THE COURT:  I have a copy.  Thank you.

21           MR. COHEN:  They could hardly be clearer.  I would

22   address your Honor to Section 2, at least on my copy it begins

23   on page 12.

24           THE COURT:  All right.

25           MR. COHEN:  You will see Rule 2, purse offer

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4

74JUMASC

1    procedures, paragraph 2.3 refers to the free negotiation

2    period, and that's what we are concerned with here.  And what

3    it says is typically 30 days for the free negotiation period,

4    however, the bottom paragraph in Section 2.3 says, "Upon

5    special circumstances the president of the WBC or the secretary

6    general, in the exercise of their discretion, may shorten or

7    lengthen the 30-day free negotiation period," and that's

8    exactly what happened here.

9           There is a long back story that is not captured.

10          THE COURT:  In other words, that would meet the

11   special circumstances that would make this particular paragraph

12   applicable?

13          MR. COHEN:  Absolutely.  And special circumstances is

14   not defined, the key is, the WBC has the discretion.  There is

15   a long back story, some of which may be captured in the

16   exhibits to the plaintiffs' submission.  Although I didn't have

17   a chance to look through them.  I only got them today when I

18   came into the courtroom.

19          In short, this is a process that goes back, really, to

20   September of last year and then was resurrected again in

21   January of this year when Mr. Peter won what is called an

22   elimination bout under WBC rules that gave him a right to fight

23   Mr. Maskaev for the heavyweight title, and since that time, Mr.

24   Maskaev has done everything possible to avoid fighting Mr.

25   Peter, tried to delay it, fight other fighters and, finally,

5

74JUMASC

1  there was a resolution as to who Mr. Maskaev has to fight next,

2  but now seeks to delay it.

3       But it is certainly no surprise to Mr. Maskaev and to

4  his promoter Dennis Rappaport that he is now fighting

5  Mr. Peter.  He has had plenty of time to prepare his options

6  and giving him two weeks to negotiate a deal is not, under the

7  circumstances, operating a hardship, and it is clearly within

8  the discretion of paragraph 2.3.

9       In addition, the complaint or perhaps in the brief

10 that was provided along with the complaint, plaintiffs have

11 said that it is actually a 45-day period, that is, there is a

12 30-day period and the purse offer happens after that, after the

13 15 days.  In fact, it is not always.  The rule says, Section

14 2.4, what it actually says, about the fourth line down, it says

15 that the purse offer must be held within 15 calendar days from

16 the date of the expiration of the negotiation period.  It

17 doesn't say after 15 days.  It says it has to be within 15

18 days.  It could be the next day.  It could be anything up to 15

19 days.  It is not a 45-day rule, so that is just wrong.

20      THE COURT:  Would you say that what you just read,

21 that it must be held within 15 calendar days from the date of

22 expiration of the 30-day free negotiation period would not

23 encompass 45 days altogether?

24      MR. COHEN:  It could, but the position staked out in

25 their papers is that it has to be at least 45 days, in other

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

6

74JUMASC

1    words, 30 days for the open negotiations and the purse offer

2    will not be held for another 15 days. And that's not what the

3    rules say. It says that you have a negotiation period of 30

4    days. And then 2.4 affirms, "unless such period is reduced or

5    extended by the president at his discretion." And so after the

6    open negotiation period and the purse offer has to take place

7    within 15 days, not no earlier than 15 days, within that 15-day

8    period. And that's what we have happening, the purse offer is

9    happening the day after the period expires.

10           THE COURT: When was the announcement? Fill me in

11   with some dates.

12           MR. COHEN: The announcement was April 9 that the

13   purse offer would take place on April 20. So in fact the

14   announcement was made April 9, and then you have from noon,

15   April 9, until April 20 for open negotiations.

16           THE COURT: So that would reduce the 30-day period by

17   quite a bit.

18           MR. COHEN: Ten days.

19           As I said, there is a long, long back story here. The

20   parties were negotiating various permutations of who would

21   fight who, when, and for what price. There was certainly no

22   surprise to Mr. Rappaport who, in large part, caused the delay.

23           It is also my understanding that, even during this

24   10-day period starting April 9 and it expires tomorrow, that

25   Mr. Rappaport has not engaged in any meaningful negotiations,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    despite our attempts to do so, despite the promoter for Samuel

2    Peter attempting to engage in those negotiations.

3              THE COURT:  Let me see if I understand the math here,

4    Mr. Cohen.  So the 30-day period was shortened to a 10-day

5    period, and then the up to 15-day period has disappeared and so

6    the one day --

7              MR. COHEN:  The day after --

8          .           Sorry to interrupt.

9              THE COURT:  So we have one day instead of 15 and he

10   got 10 days instead of 30?

11             MR. COHEN:  Except that the 15 days is just an end

12   point.

13             THE COURT:  I understand.  But he could have 15 days.

14   Just for the sake of argument, I am comparing one day with 15

15   days.  I am comparing 10 days with 30 days.

16             I know that you have not gone into the special

17   circumstances, and if necessary I will ask you to do that.  I

18   just want to make sure that I have the complete picture.

19             MR. COHEN:  I don't actually think that is the

20   complete picture.  It is the complete picture as far as the

21   math goes, but there is a long history.

22             Samuel Peter fought a boxer by the name of James Toney

23   in September of 2006 in what was called an elimination bout and

24   what that means, under WBC rules, is the winner gets to fight

25   the champion, Mr. Maskaev.  It was a close decision that

8

74JUMASC

1    Mr. Peter won to fight Mr. Maskaev.  The WBC instead ordered a

2    rematch because it was a close fight, so Mr. Peter and

3    Mr. Toney fought again in January of this year.  Mr. Peter won

4    again the right to fight Mr. Maskaev.  In the meantime,

5    Mr. Maskaev didn't want to sit idly by waiting for the second

6    fight, sought permission to fight an interim fight against an

7    opponent that he picked.

8            THE COURT:  Against who?

9            MR. COHEN:  That Mr. Maskaev picked.

10           What was interesting about that fight was that it was

11   subject to a condition imposed by the WBC and agreed upon by

12   Mr. Maskaev and Mr. Rappaport that, if Maskaev won that interim

13   fight, the next fight would be against the winner of the second

14   Peter/Toney fight, and Rappaport made statements to the press

15   to that effect, that his next fight would be against the winner

16   of the Peter/Toney fight.

17           Lo and behold, Peter wins again.  We seek to open

18   negotiations.  They don't want to negotiate.  They want to

19   fight a different fighter by the name of Vitali Klitschko who

20   retired but was seeking to return, and that became the subject

21   of a dispute that involved Mr. Maskaev, Mr. Klitschko, the WBC,

22   who you have on the phone.

23           All four parties worked very hard to negotiate a

24   solution to that, very hard.  And at the last minute,

25   Mr. Maskaev, Mr. Rappaport walked away from what everyone

9

74JUMASC

1    believed was a reasonable settlement, walked away, forced the

2    parties to go back and try to come up with another solution.

3            All the while plaintiffs were promising to pay

4    millions of dollars to our client to allow Maskaev to fight

5    another fight. Ultimately, they couldn't deliver. They didn't

6    have the money. They didn't have the fight against Klitschko,

7    couldn't get a date or venue. They couldn't do the fight they

8    wanted to do, and they came back to us and said, OK, now we

9    have to fight you. And that is, in very short order, how we

10   got to where we are.

11           THE COURT: So those are the special circumstances,

12   otherwise known as complete aggravation with the plaintiff?

13           MR. COHEN: That is a nice way --

14           THE COURT: I am not making that as a serious comment,

15   but I certainly understand with all of the back and forth that

16   it might indeed get into the paragraph that starts out with

17   under "special circumstances."

18           MR. COHEN: It is more than just aggravation, because

19   there has been some severe harm to Mr. Peter. That harm has

20   come in the form of loss of TV opportunities, loss of venue

21   opportunities. Samuel Peters, by all rights, should have been

22   fighting for the WBC heavyweight championship sometime not long

23   after September of '06. And then due to circumstances, not

24   long after January of '07. Here we are in April and we still

25   can't get a fight and that's what this has all been about,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    trying to get a fight.  A recent press statement said that we

2    wasted a lot of time.  That's the special circumstances.

3              THE DEPUTY CLERK:  Mr. Lenhardt?

4              I think that we have lost Mr. Lenhardt.

5              THE COURT:  Where is he physically?

6              MR. EISENSTEIN:  Dallas, Texas.

7              THE DEPUTY CLERK:  Mr. Lenhardt, I am going to put you

8    on speaker right now.

9              MR. LENHARDT:  I can barely hear you.  There is a loud

10   buzzing noise.

11             I don't want to hold up the proceedings.

12             THE DEPUTY CLERK:  I am going to ask you to hold one

13   more time.

14             MR. LENHARDT:  Yes, sir.

15             THE DEPUTY CLERK:  Mr. Lenhardt, can you hear us now?

16             MR. LENHARDT:  Very well.  Thank you.

17             THE COURT:  I am not exactly sure at what point we

18   lost you.  Could you sort of tell us, perhaps, the last thought

19   that you heard or the last argument you heard and we will try

20   to bring you up to speed.

21             MR. LENHARDT:  Your Honor, I apologize.  I don't think

22   that I heard any of the arguments.  I heard just Mr. Delaney's

23   comments, and then we faded out.  I believe I already know the

24   arguments that are being made, but I apologize, I didn't hear

25   any.

74JUMASC

1          THE COURT:  Fortunately, Mr. Cohen is doing an

2    excellent job setting forth the position on the merits and we

3    were at the point where I actually did make him go into what

4    the special circumstances were that would call into play the

5    third paragraph under 2.3 on page 12 of the WBC rules, and he

6    did that.

7          If you will continue, Mr. Cohen.

8          MR. COHEN:  Thank you, your Honor.

9          THE COURT:  If you will continue slowly.

10          MR. COHEN:  To just sort of close the loop on that

11   thought, as I said before, it is more than just aggravation,

12   there has been real harm caused by the delay, losing these

13   opportunities.  And so, again, just to underscore, it is more

14   than just frustration with how the negotiations have gone.

15          The second point I would make as to the merits, I

16   refer your Honor to Section 2.12 at page 14 of the WBC rules.

17   And it sets forth the purse list for a championship fight.  And

18   you will see in the typical ordinary course, subparagraph A, 70

19   percent for the champion and 30 percent for the challenger.

20          But I refer your Honor to subparagraph D:

21   "Notwithstanding the terms of subparagraphs A, B and C above

22   the board of governors may, in its discretion and by a majority

23   vote, modify the division of purse offer proceeds between

24   boxers and a purse offer in unusual or special cases, like the

25   consideration of the outstanding marketing value of one of the

12

74JUMASC

1  boxers.  The modification of the split will be limited to three

2  categories, 70/30, 60/40 and 55/45 for the champion and

3  challenger respectively."

4          Then that is something WBC is clearly entitled to do

5  in its discretion, and that's what they have done and that's

6  what they are entitled to do.  Again, the same sorts of special

7  circumstances would entitle WBC to invoke its discretion to do

8  that.

9          And that's really it as to the merits.  Those two

10  provisions or, really, three provisions -- 2.3, 2.42 and

11  2.12 -- give the WBC the discretion to do exactly what it did.

12  And there's really no complaint that plaintiffs can make.  They

13  agreed to abide by these rules.  It is the overarching premise

14  of Mr. Maskaev's career, to abide by these rules.  He is the

15  WBC champion, and the trade-offs of being able to fight for the

16  WBC championship is to abide by their rules.

17          I think at this point it is probably a good time to

18  turn it over to Mr. Lenhardt who, I believe, is going to

19  address the administrative remedies.

20          THE COURT:  5.1, et al?

21          MR. COHEN:  I believe that's right, yes.

22          THE COURT:  Mr. Lenhardt.

23          MR. LENHARDT:  Exactly right.

24          One of the issues here, your Honor, is that the WBC

25  rules and regulations, to which all parties are required to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

13

74JUMASC

1    agree in terms of doing business with the WBC, fighting for or

2    holding any of our championships, are the exclusive alternate

3    dispute mechanisms and regulations in Rule 5.

4            You will see, if you have a copy in front of you, Rule

5    5.1 talks about the exclusivity of remedies and the dispute

6    procedures provided for herein.  Section 5.2 requires any party

7    within 15 days of having a dispute with the WBC to submit it in

8    writing to the WBC.

9            No claim was made by the Maskaev camp for relief prior

10   to the communication that we had by telephone yesterday in

11   terms of postponing the first bid or making any specific

12   requests to appeal the decision of the board of governors to

13   change the purse split from the 70/30 to the 55/45 that is

14   permitted under the WBC rules.

15           Rule 5.3 requires compulsory mediation if the

16   aggrieved party is not satisfied with the resolution of the WBC

17   administrative procedures.

18           And if that is not successful, then Rule 5.4 requires

19   mandatory arbitration before the court of arbitration for sport

20   and, again, none of these procedures have been followed by the

21   Maskaev camp with respect to the matters being complained about

22   today.

23           Rule 5.5 says that any person having a claim against

24   the WBC waives all other remedies and causes of actions

25   provided for herein.

74JUMASC

1      So your Honor, we believe that the request before your

2   court, without having followed these mandatory alternate

3   dispute resolution procedures, is flawed.

4      THE COURT:  All right.  Anything else that you would

5   like to say, Mr. Lenhardt, before I give Mr. Eisenstein an

6   opportunity to respond both to Mr. Cohen and to you?

7      MR. LENHARDT:  First, I do apologize that I was not

8   able to be present or have other counsel.

9      I have a letter from another attorney, Mark Kirkorsky

10   of Tempe, Arizona dated February 1, 2007 on behalf of the

11   champion Maskaev and his promoter Dennis Rappaport, and if I

12   may, I would like for the Court to hear the statements therein.

13      THE COURT:  What was the date of that letter?

14      MR. LENHARDT:  February 1 of this year, your Honor.

15      It is entitled "Compulsory Mediation and Arbitration,"

16   and it is addressed to the WBC.

17      It says, "The failure to comply with a direct order

18   issued by the WBC and a failure to participate in good faith in

19   the mediation process as mandated by Rules 5.3 and 5.3F is a

20   direct violation of the rules and regulations.  The rules and

21   regulations mandate a step-by-step process."

22      The letter goes on.  He says, "The words 'compulsory'

23   and 'mandatory' have meaning.  These are not voluntary

24   processes but, rather, are necessary components of the

25   progression."

15

74JUMASC

1          He goes on to say that it should be emphasized that

2     pursuant to Rules 5.1 and 5.5, these rules and regulations

3     clearly and unequivocally provide the exclusive remedies to

4     "any boxer, promoter, manager or other person or organization

5     that participated in activities or events of the WBC, or avails

6     themselves, or claims any right arising under the WBC

7     constitution or these rules and regulations."

8          He goes on to say, "The bottom line is, clearly, that

9     no party to this matter has the right or option to sidestep or

10    violate these rules and regulations."

11         Later he says, "Moreover, a failure to enforce the

12    rules and regulations sets a dangerous precedent."

13         So I would argue, your Honor, that Maskaev and his

14    representatives have already themselves made a very strong

15    argument in favor of the alternate dispute resolution in the

16    WBC rules and regulations.

17         THE COURT:  Thank you, Mr. Lenhardt.

18         Mr. Eisenstein.

19         MR. EISENSTEIN:  Let me start with the last point,

20    Judge, the letter that Mr. Lenhardt has been reading from is

21    Exhibit 9 in my papers.  And it is addressed specifically to a

22    blatant violation by Mr. Peter, Mr. Cohen's client, of the

23    direct order of the WBC.

24         Mr. Peter comes before you as a party which just two

25    months ago flouted Rule 5.  And the WBC comes before you as a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    party which just two months ago permitted Mr. Peter to flout

2    its direct order to go to Rule 5 arbitration.

3            Rule 5 is an incomplete remedy because, even with the

4    court of arbitration, it doesn't have the power -- no part of

5    that remedy has the power ultimately to compel the WBC to do

6    anything.  So my arguments with respect to this claim that we

7    should have been going to the alternate dispute resolution

8    process are as follows.

9            A.  Both the WBC and Mr. Peter come before the Court

10   in this equitable proceeding with dirty hands, which last time

11   we looked was still an issue in an equitable proceeding.

12           B.  Maskaev did appeal, and it is in Exhibit 12,

13   specifically for the relief that I am now before this Court

14   seeking, which is an extension of the negotiating period to the

15   length that the rules ordinary permit.

16           THE COURT:  What exhibit is that?

17           MR. EISENSTEIN:  It is 12.

18           THE COURT:  The letter dated April 10?

19           MR. EISENSTEIN:  No.  I apologize.  I picked out the

20   wrong one.

21           THE COURT:  Take your time.

22           MR. EISENSTEIN:  It is Exhibit 15 on the third page at

23   the bottom.  Mr. Kirkorsky, who represented the same clients I

24   do --

25           THE COURT:  Let me make sure this is a letter dated

74JUMASC

1       April 13, 2007 --

2               MR. EISENSTEIN:  Right.

3               THE COURT:  -- addressed to Mr. Lenhardt and signed by

4       Mr. Kirkorsky?

5               MR. EISENSTEIN:  Correct.

6               THE COURT:  What page did you say?

7               MR. EISENSTEIN:  The next to the last page at the very

8       bottom.

9               THE COURT:  "Please consider this letter a formal

10      demand" --

11              MR. EISENSTEIN:  -- "for an immediate extension of the

12      deadline for free negotiation."

13              So I will say to your Honor that we have not gone

14      through the other steps.  There is no question about that.  But

15      we made a formal appeal.  We made an administrative appeal to

16      the head of the WBC for an extension.  It is not the case that

17      we came into court without having sought from the organization

18      who we are now suing the relief that we are seeking from the

19      Court now.  We sought it.  We were turned down.

20              With respect to the question of whether we have to go

21      to Switzerland to get an ineffective remedy after Peter thumbed

22      his nose at that process and the WBC permitted him to do so, I

23      suggest to the Court that it does not lie in their mouth to

24      make that claim.

25              THE COURT:  May I just ask, did Mr. Peter flout that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    regulation, as you put it, in order to pursue some remedy in

2    court?

3            MR. EISENSTEIN:  Yes.  He specifically said, I reserve

4    all of my rights and you are going to be sued -- and if you

5    give me a moment I will find the letter to that effect.

6            It is Exhibit 7, a letter from Mr. Cohen's colleague,

7    Mr. Burke of Kramer Levin.

8            THE COURT:  Dated January 31?

9            MR. EISENSTEIN:  Correct.

10            THE COURT:  All right.  May I ask if this resort to

11    judicial remedy by Mr. Peter involved the issues in this case

12    or was it another bout altogether?

13            MR. EISENSTEIN:  It is this.  And I think that I can

14    do it in about 38 seconds.

15            The source of the problem that I'm advancing upon the

16    Court to seek help with is that the WBC gave two people the

17    right to dance with Maskaev.  It gave Mr. Peter that right by

18    declaring him the No. 1 contender.  It gave that same right to

19    a fighter named Vitali Klitschko in January of this year who

20    was a retired champion of the WBC.  And when Klitschko

21    retired --

22            THE COURT:  Was he not defeated by Mr. Peter in

23    January?

24            MR. EISENSTEIN:  No.  That is Toney.

25            Klitschko is a Russian fighter or a Ukrainian fighter

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

19

74JUMASC

1     who retired in 2005 and was declared champion emeritus.  And

2     the WBC said when he retired, if you ever come back to boxing,

3     you will be given the position of No. 1 contender.  And that is

4     sketched out in my papers and Mr. Rappaport's affidavit.  So

5     there were two competing fighters who had exactly the same

6     claim.  Maskaev is the champion.  Peter wants to fight him and

7     says, I am the No. 1 contender.  I am the official designated.

8     Vitali Klitschko says the same thing.

9              THE COURT:  Let me talk about good faith here.  It

10    seems to me that the WBC did not have any control over when

11    Mr. Klitschko would want to come out of retirement.

12             MR. EISENSTEIN:  True.  But it had the power to

13    adjudicate when Mr. Klitschko came out of retirement and

14    presented a completing claim.  It had to designate who is the

15    person.  And it spent three months, January until April,

16    passing the buck, essentially.  It voted -- and this is in my

17    affidavit -- for the Klitschko fight against Maskaev.

18             Then it said, well, the three of you are going to have

19    to work -- first it said, the three of you have are going to

20    have to go to Rule 5.1.  And that is the direct answer to the

21    Court's question, is it the same or is it different.  I think

22    it is very closely related.  It is exactly why this process has

23    taken so long, because from January until April there were

24    three people trying to fit in a ring that only takes two.

25             And the body that is in charge of this, the WBC, first

74JUMASC

1    said, you all go to this dispute resolution process.

2            Peter says, I'm not doing that.

3            The WBC says, can't we all work this out, and

4    basically takes a passive role and there ensued unsuccessful

5    negotiation.

6    .        And I will fast forward because at a certain point,

7    Klitschko, namely, in April, this month, said -- excuse my

8    colloquialism -- I'm out of here.  I don't want to play

9    anymore.

10            So at that point, April 6, Maskaev said to the WBC.

11    OK, it is no longer a three-way problem.

12            And, parenthetically, I will say that, I appreciate

13    Mr. Cohen as an advocate.  I am as well.  He can say that there

14    was aggravation.  He can say it's all Mr. Rappaport's fault.  I

15    would say it is all Mr. Peter's fault, and that would have to

16    be sorted out in some fashion.

17            But what remains as a fact is that, until April 6,

18    there were three people in a situation that only accommodated

19    two.  And that was the doing of the WBC, and the WBC did not

20    step up to resolve it.  And when it got resolved, my people,

21    Maskaev said, OK, we have only two people now, and the WBC

22    turned around and said, OK, you have 10 days to work this out.

23    You have 10 days to work something out which was, for the first

24    time, only Maskaev and Peter.  Up to that point, there had been

25    various combinations and permutations.  Mr. Peter was going to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    step aside.  He didn't like the money that was being offered

2    for that.  He wanted the money upfront.  He changed his mind

3    about that.  There were all kinds of back and forth.

4         You don't need to resolve those issues, your Honor,

5    because they were a function of the fact that there were three

6    people where only two can fit.  And the reason to try to work

7    that out, when the governing body was not stepping in and

8    saying, look, we made a mistake, you are going to have to go

9    behind -- that's how it could have gotten resolved long ago.

10   It didn't.  It got resolved only by Klitschko getting out of

11   it.  So for the first time on April 9 is when the fog cleared,

12   and it was clear that Maskaev's only opponent, mandatory

13   opponent was Peter.

14        What I am saying, I wouldn't be here if we were only

15   talking about the split.  The split is money.  I am not

16   claiming that there is irreparable harm there.

17        What is irreparable harm is that the purse bid is set

18   for tomorrow.  The purse bid means that a stranger to this

19   entire scene can come in and buy the rights to promote this

20   fight and then enter into new contracts with a site where the

21   fight will occur, a television outlet to exhibit it.

22        And if the Court were thereafter to sustain our claim

23   and to find that the purse bid was in fact put in place in

24   violation of Mr. Maskaev's right to the ordinary 30-day period,

25   the untangling of that and the rights of what I will call, for

74JUMASC

1    want of a better term, buyers for value without knowledge or

2    holders in due course almost of rights that go out in various

3    directions, that's the irreparable harm.

4          And I cited to the Court Judge Chin's decision in

5    M'Baye v. WBA where he addresses that kind of situation where

6    it is difficult or impossible to put the parties back in the

7    position they had before.

8          And I am suggesting to the Court that it is that kind

9    of irreparable harm that is associated with the purse bid going

10   on tomorrow.  That's all I'm asking this Court for.  I'm asking

11   for an opportunity that Mr. Maskaev -- Mr. Cohen says that Mr.

12   Maskaev has an obligation to the WBC.  Well, the WBC has an

13   obligation to its champions as well.  It has an obligation

14   under the cases I cited not to act in an arbitrary and

15   capricious fashion, not to treat him unfairly and not to

16   operate in bad faith in relation to him.

17         And I have put forward what I consider allegations --

18   they are not proven yet, they are in my papers -- that suggest

19   that they have acted in bad faith in this situation.  I have

20   asked for very specific relief, which is only that he be put in

21   the position that the champion ordinarily has, and be given the

22   opportunity to negotiate.

23         I suggest to the Court that, both with respect to the

24   difficulty to disentangle issue and with respect to the other

25   branch of the obligation of a movant such as myself, which is,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    that I have shown sufficiently serious questions on the merits.

2          Of course, there are exceptions.  The question is not

3    whether there are exceptions to the rule.  We say that in our

4    papers.  It is clear to me that the question is how those

5    exceptions were brought to bear and whether they were brought

6    to bear in an arbitrary and capricious way.

7          I suggest to the Court that, with those showings and

8    the fact that I am simply asking for a delay in the purse bid

9    to provide the ordinary period, that I have met the burden.

10        THE COURT:  Mr. Lenhardt, would you address what I

11    understand Mr. Eisenstein to say, that the WBC abdicated its

12    responsibility when there was a three-way circus and therefore

13    created delay and the problem and actually had no role in

14    solving it, except for the fact that Mr. Klitschko on his own,

15    for whatever his reasons, decided to just walk away so that the

16    WBC took no actions in those circumstances which would then, I

17    think, put the WBC in a different footing in terms of saying,

18    now we want him to abide by the rules when we permitted others

19    not to and we didn't do our jobs ourselves.

20        MR. LENHARDT:  I would be happy to address those, your

21    Honor.

22        The first thing I would like to say is that, in terms

23    of the WBC being accused of acting in an arbitrary or

24    capricious fashion, it is a bit disingenuous for the Maskaev

25    camp to be complaining at this point because, when Vitali

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    Klitschko announced that he was returning and, yes, he had a

2    claim based upon when he retired because the WBC president did

3    announce, if he wants to return that he will be in a mandatory

4    position.

5         We recognize that Samuel Peter has also won a final

6    eliminator and had also won a rematch as that final eliminator

7    and, therefore, Mr. Cohen was arguing that Mr. Peter had the

8    right to proceed and the WBC did not have the right under their

9    rules and regulations, although there are specific provisions

10   that discussed the return of a fighter and the circumstances

11   for us to rule that that person is eligible to fight.

12        Mr. Maskaev's representatives said that they wanted to

13   fight Klitschko.  They were the ones encouraging and playing an

14   active role in the process.  So rather than saying no,

15   Mr. Peter had won a final eliminator and a rematch as a final

16   eliminator, quite the contrary, they were interested in

17   fighting Mr. Klitschko because you had two Eastern bloc

18   fighters.

19        There was discussion about having the bout in

20   Moscow -- a very, very lucrative fight and a lot of discussion

21   about paying a step aside fee, which sort of is not customary

22   in boxing or some people might say it is not a step aside fee

23   because they feel that the Maskaev people will not necessarily

24   feel that Mr. Peter had an indisputable right to fight before

25   Mr. Klitschko did.

74JUMASC

1     So, yes, we had two different parties that were both

2     claiming the right to fight first against Mr. Maskaev.  The WBC

3     believed that it was not in a position to make a decision and

4     that its rules and regulations provided for, first, a

5     compulsory mediation and then a mandatory and binding

6     arbitration.  And we felt that it was a way, considering that

7     people might argue that we were acting in an arbitrary and

8     capricious fashion, instead to let an independent, third party

9     make that decision.  So the WBC feels that it was completely

10    justified in referring all the parties to that process.

11          As far as whether or not we demanded that the Peter

12    camp follow the alternate dispute regulations from the WBC, we

13    demanded that consistently.  When Kramer Levin became involved,

14    we consistently said to Mr. Peter and his representatives at

15    Kramer Levin that we believed that the appropriate venue for

16    the hearing and the resolution of their dispute with the WBC

17    was also to hold a court of arbitration for sport in

18    Switzerland.

19          So I would make the same argument that we made with

20    the Samuel Peter people, which is that we have a network that

21    provides for an independent venue and arbitration to resolve

22    this in a way that doesn't involve the New York courts which we

23    don't feel have a particular jurisdiction here.

24          And, again, we just didn't want to be disingenuous

25    that the Maskaev camp, which was on the WBC side, if you will,

74JUMASC

1    in terms of letting Klitschko have his day in court, if you

2    will, in Switzerland and is now taking a different tact and,

3    again, we did not operate in an arbitrary and capricious

4    fashion in trying to help resolve the dispute in an amicable

5    way.

6              THE COURT:  I just have a few questions for you, Mr.

7    Lenhardt.

8              Have there been other champions that have retired and

9    decided to come back into the ring?

10             MR. LENHARDT:  Yes, your Honor, there have, and it's

11   almost universal.

12             THE COURT:  My question is, were other people already

13   appointed, if you will, to fight the champion at the time that

14   that happened?

15             MR. LENHARDT:  I cannot point to a specific

16   circumstance.  I have not researched the point other than to

17   say that we certainly can do that, but the history of champions

18   coming back and receiving title shots, everyone from Joe Louis

19   and people of that great stature having the opportunity to

20   return to the ring after announcing retirement -- Sugar Ray

21   Leonard is a good example.  He came back and fought against

22   Marvin Hagler.  So there are many situations in which former

23   champions return and are given a title shot in a way that is

24   comparable with what we are talking about with the Klitschko

25   situation.

27

74JUMASC

1           THE COURT:  But my question is, at the time that they

2       announced that they were coming out of retirement, had the WBC

3       already anointed the next person to fight the champion?

4           MR. LENHARDT:  I cannot point you to a specific

5       example, your Honor.  But one point I can make is that the WBC

6       recently in the last three, four or five years has been

7       mandating its rules and regulations.  And when the Moskow

8       convention was over, in the fall of 2003 or December 2003, the

9       WBC added a rule that provided for a champion emeritus status,

10      which is a designation for a former champion that provides him

11      upon retirement -- and because Klitschko is one of a handful of

12      former champions who were given that designation and a great

13      portion of his claim to be able to return and receive an

14      immediate title shot was based upon his designation as a WBC

15      emeritus champion, of which I think there are maybe three or

16      four to date.

17          THE COURT:  That's fine.  I don't really care if you

18      go beyond that three-year period before you put in that right

19      to come back as a champion.  My real point is, how did you

20      handle this in the past when you had already told A that he

21      would be the next person to fight the champion, and then a

22      retired champion came out and insisted on his right?  How was

23      this handled in the past?

24          MR. LENHARDT:  Your Honor, I have been serving in my

25      pro bono, voluntary role as WBC general counsel for probably

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    about two, two and a half years.  So, unfortunately, I cannot

2    speak from personal experience to your question.

3            THE COURT:  You understand why I am asking it, though?

4            MR. LENHARDT:  Of course.  I will say that we recently

5    in Spain in 2005 enacted a new provision for the WBC rules and

6    regulations that clarified what would happen in a specific

7    circumstance such as this.

8            What the rule says is that, upon the return of a

9    former champion, if there is a contender who is a mandatory

10   champion at the time, that the WBC has the right to permit this

11   new contender to come in, in the case of unification bout which

12   is typically very important in the sport, that the mandatory

13   contender has to wait until that bout occurs, that is Rule

14   1.21B(10).  It says, "Under extreme special circumstances such

15   as a unification bout or a proposed bout with a legendary boxer

16   that could result in great promotion, prestige and importance

17   for the sport of boxing, the WBC may sanction such bout as a

18   mandatory bout.  If a mandatory challenger had already been

19   appointed by the WBC, the winner of the special bout would then

20   face the mandatory challenger without an intervening contest."

21           So this rule was enacted in November or December of

22   2005.  So the rules that we follow in these circumstances is of

23   very recent vintage.

24           THE COURT:  Does that mean that it is invalid?

25           MR. LENHARDT:  No, quite the contrary.  In fact what I

74JUMASC

1    am saying, your Honor, is that the appeal in this circumstance,

2    was based upon a rule that very recently was enacted by the

3    WBC.  So to the extent that you are asking what the WBC did

4    under similar circumstances in the past, I do not have a

5    specific circumstance that I can point to since it predated my

6    involvement with the organization, but I can tell you that the

7    rule that is applicable did not exist previously and,

8    therefore, your Honor's request for specific circumstances,

9    that would have been when the rules were different.

10          THE COURT:  I would have taken custom and practice

11   without a rule before 2005, but since there is some rule in

12   2005, why wasn't it applied here?

13          MR. LENHARDT:  What the rule permits is for the WBC to

14   make a ruling in the discretion of its board of governors to

15   permit such a challenger who is returning such as Vitali

16   Klitschko to have that bout, in which case Mr. Peter would have

17   had to wait until the Maskaev/Klitschko bout had occurred.

18          The WBC did not make a ruling in that circumstance

19   because Mr. Klitschko was not only claiming that the WBC should

20   appoint him as the immediate challenger, but that we had no

21   choice but to do otherwise.  He was arguing that his champion

22   emeritus status and that certain promises that he claims were

23   made to him by the WBC meant that we had to appoint him as the

24   immediate mandatory challenger over Mr. Peter.

25          Obviously, Kramer Levin and other representatives of

74JUMASC

1    Mr. Peter argued that their boxer, having paid the sanction

2    fees had the right, if not only the negotiation but the

3    discretion to appoint him, but he had the right.

4           The reason that the WBC did not choose one or the

5    other is that both were claiming the right and demanding the

6    right to first fight Mr. Maskaev, and therefore we felt that

7    the appropriate venue for the resolution of that was the court

8    of arbitration for sport in our rulings and regulations.

9           THE COURT:  But I don't understand it, since you have

10   the discretion to do it, and the fact they both demanded it.

11          Now, of course, if I wanted something very badly, I am

12   not going to go in and say I think I should get it.  I would go

13   in and I would say, this is mine, and I will fight you if you

14   don't give it to me.  So the fact that the two of them, both of

15   them claimed a right, apparently was not based on the two of

16   them being there simultaneously, but in the ordinary course.

17   If there had been no one in Mr. Peter's position, Mr. Klitschko

18   would get it.  If there had been no one in Mr. Klitschko's

19   position, Mr. Peter would get it.  So they did have incidental

20   rights, but I don't see why that is a reason to abdicate your

21   authority and ability or discretion, however you want to look

22   at it, to make a decision and get this thing moving way before

23   it turns up here.

24          MR. LENHARDT:  I understand your Honor's comments.

25   Obviously, we took a different view.  Given the several

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

74JUMASC

1    accounts as well as other things, the parties were claiming

2    that we were acting with some bias.  The best way was to not

3    take a view which one or the other would say that they were

4    damaged and aggrieved and, frankly, say if Mr. Peter had lost

5    and we had appointed Mr. Klitschko as the challenger, I have a

6    feeling that Mr. Cohen would be at your court asking for a

7    temporary restraining order to prevent that bout from occurring

8    as well.

9         Having said all of that, we believe that now that the

10   parties have agreed that Mr Klitschko will take the second

11   mandatory position and Mr. Peter, the first, the WBC felt that,

12   since this had been going on since January with all of the

13   parties talking, the best way was to work up a purse offer as

14   soon as possible.  And I think that we heard the orders were

15   coming out somewhere around the 6th of this month and the offer

16   for the 20th.  We felt that, given the fact that the parties

17   had been in discussion for so long, that a shortened period

18   would have been appropriate, to the extent that the Maskaev

19   camp is complaining that there had been a delay.  Now that

20   dispute has been resolved, the WBC believes that the purse

21   offer sooner rather than later is the best way to proceed and

22   to let Mr. Maskaev, because of his championship, in the ring,

23   as well as Mr. Peter.

24        So, again, we think that this is something that would

25   advance the cause of getting this resolved.  I am saying the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    fact that Mr. Peter's representatives were in your court

2    initially contesting this shows that the free negotiation

3    period under the WBC rules and regulations which was intended

4    to give the parties the opportunity to come to a mutually

5    beneficial agreement, apparently it is not going to work and,

6    therefore, the purse offer process which permits promoters to

7    bid and whoever made the highest bid wins, the boxers maximize

8    their purse.  This was intended to be fair to all parties, and

9    we believe that it is appropriate to move forward.

10             May I also say that, had Mr. Maskaev's people brought

11    a claim in a court of arbitration for sport, and the court of

12    arbitration had ordered the WBC not to proceed with a purse

13    offer, of course we would have respected that as well.

14             THE COURT:  Nobody is purer than the driven snow here.

15    Everybody is coming in with slightly soiled hands.

16             This is a court of equity.  It seems to me that if

17    Mr. Maskaev was not completely and solely the obstruction for

18    the last several months, that it is sort of unseemly to

19    penalize him by shortening the period and giving the 55/45

20    split.

21             It seems to me that you, the WBC, could have resolved

22    this.  You chose not to and you didn't and if you are just as

23    responsible for the delay from January as either Mr. Maskaev or

24    Rappaport Productions or even Mr. Peter.  So it seems to me

25    that if you wanted to look good and nobody thinking that you

74JUMASC

1   were taking one side or the other having bias, what you could

2   have done here is to use the ordinary course, have the normal

3   30 days with up to but not necessarily 15 days and then, if it

4   didn't work out, then you had the right to put the purse up for

5   a bid.  It is like you are angry because the negotiations took

6   longer because you didn't do what you could do.  I just don't

7   understand that.

8          MR. COHEN:  Judge, could I respond?

9          THE COURT:  Sure.

10         MR. COHEN:  The notion that Mr. Maskaev is somehow

11  being penalized sort of flies in the face of the whole history.

12  And I understand your Honor doesn't have the entire background.

13  But to say that their camp was obstructionist in terms of

14  getting a deal done is to put it mildly.

15         There is one aggrieved party here, and that is Samuel

16  Peter.  He earned the right to fight months and months ago.

17  Mr. Maskaev and Mr. Klitschko did what they could to try to

18  thwart that right.

19         It is sort of funny thinking about the whole process

20  to suggest that the WBC is somehow biased in Mr. Peter's favor

21  and is giving him a special first bid out of some bias when it

22  is clearly inconsistent with everything that has gone on with

23  the WBC --

24         THE COURT:  I didn't say it was biased against

25  Mr. Peter.  What I was saying is that it said it didn't want to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    make a decision so that it wouldn't appear as if it was biased.

2    What I am saying is, because it didn't act, to all of a sudden

3    change the rules on Mr. Maskaev does seem unseemly.

4            MR. COHEN:  It wasn't changing the rules.

5            I would add too, the notion that on April 6 it became

6    clear that Maskaev/Peter was going to happen, it is just not

7    true.

8            First of all, Samuel Peter won his second elimination

9    bout against James Toney January 6, 2007.  The very next day,

10   the promoters for Samuel Peter reached out to Dennis Rappaport.

11   Let's start negotiating.  This was before Klitschko had said, I

12   want to come back.  Rappaport didn't respond, didn't want any

13   part of negotiations then.  He wanted to wait and see if he

14   could do a better deal, see if he could find a way around

15   fighting Mr. Peter.

16           Again, our understanding is that, since April 6 or

17   April 9 -- I should say April 6, when it became clear that

18   Maskaev/Peter was the next fight, they have done virtually

19   nothing to negotiate.  Promoters for Mr. Peter tried to

20   negotiate with Mr. Rappaport.  They have done nothing.  So the

21   notion that another couple of weeks is going to change

22   something that is, frankly, inconsistent with their actions.

23           I would also like to address the unclean hands point

24   because I think it is an important one, and I am glad that

25   Mr. Eisenstein has attached Exhibit 7 to his submission which

74JUMASC

1    is his letter from my colleague Barry Berke.  In that letter he

2    explains why we didn't think the mandatory provisions of Rule 5

3    of the WBC rules didn't apply, and that even though Mr.

4    Klitschko had retired -- the WBC, as I believe as your Honor

5    has recognized, the WBC had not made a decision at that point

6    and the WBC mandatory arbitration rules say, anyone who wants

7    to challenge a WBC decision must go to arbitration.  So we took

8    the decision to arbitration, and we don't need to seek an

9    advisory opinion.

10        We also had at that point claimed what we believed

11    sounded in contract against WBC, not a claim under the WBC --

12        THE COURT:  Slow down and speak up.

13        MR. COHEN:  Sorry, you Honor.

14        We had made a claim, and believe we still do, subject

15    to what happens as a result of the current state of play, but a

16    contract claim against the WBC where they promised Mr. Peter

17    that if he won the second fight he would be the next to fight

18    Maskaev, and that was separate and apart from the WBC rules.

19    So it was a contract claim, not a claim under the WBC rules

20    and, therefore, we believed it was at least arguable that it

21    didn't belong in arbitration, that we would have a right to

22    come into court.

23        That said, my adversary has talked about Peter

24    resorting to a judicial remedy rather than arbitration, and

25    your Honor asked about that.  In fact, there has never been any

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    resort to judicial remedy as of yet.  Mr. Peter has never filed

2    an action, whether in arbitration or the court.  So there

3    hasn't been judicial remedy.  As it is clear, it certainly was

4    an arrow in the quiver that we had at the time that the dispute

5    first arose.  The notion that we come in with any kind of

6    unclean hands is flatly belied by the positions staked out in

7    the various exhibits attached.

8         Also, I think the notion that somehow after the purse

9    bid it is not just about money because, after the purse bid,

10   there were contracts that you would have to disentangle, it is

11   still a money issue.  You are still talking about something

12   that could be compensated in money damages if they were somehow

13   to prevail on these theories that seemed to be barred under WBC

14   rules.

15        The case that is cited in their papers has nothing to

16   do with post purse bid contracts, couldn't find irreparable

17   harm from that.  What it found was the potential for

18   irreparable harm if a fighter was skipped over for the

19   opportunity to fight for a championship.  That is not what is

20   happening here.

21        This is about a championship fight.  There is no doubt

22   that Mr. Maskaev, regardless as to what happens with the purse

23   bid, is fighting to retain his championship.  There is no doubt

24   that Mr. Peter will be fighting for that championship.  So it

25   just doesn't apply.  It is a different set of circumstances and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1 a different set of concerns as far as the irreparable harm

2 goes.

3  So to come back, the equities, the submission from the

4 Maskaev camp flies in the face of everything that has happened

5 since January 6, and Samuel Peter, once again, had earned the

6 right to fight Mr. Maskaev.

7  There have been statements from people in the Maskaev

8 camp, including Dennis Rappaport that have turned out to be

9 flatly untrue. As your Honor has heard, there was an attempt

10 to negotiate a step aside where Samuel Peter would say, you

11 know what, we are not going to arbitrate. We are not going to

12 litigate. We are not going to pursue this, provided that you

13 guys pay us a certain amount of money, which is an amount that

14 they came up with. They offered it to us.

15  We said, yeah, let's explore that. Let's walk down

16 that road. There were promises made, amounts of money that

17 they were going to pay us, and every time it came time to pony

18 up that money, there was another reason. We don't have it yet.

19  They sent us what purported to be a wire transfer from

20 Russia showing that they had money in their account that they

21 were going to give to us. Well, guess what? There was no

22 money there. Never happened.

23  So at every turn, the Maskaev camp -- putting aside

24 our right to fight, Mr. Peter's right to fight for the

25 championship, putting all of that aside, they even thwarted the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    very agreement that would have given them what they wanted,

2    which was a fight against Klitschko somewhere overseas.  And

3    that was something that happened for a long time.  So the

4    notion that somehow they come in with clean or at least cleaner

5    hands is belied by what actually happened.

6         And Mr. Eisenstein has only recently come on to the

7    case, but that's how we got to where we are today.  We could

8    have had an agreement months ago.  As I said to your Honor,

9    essentially, at the eleventh hour, much like this filing at the

10   eleventh hour, they walked away from a four-party deal with the

11   WBC, with Klitschko, with us.  Just walked away.  So that's

12   where we are.

13        Again, the notion of unclean hands and our refusal to

14   arbitrate, there were valid, legal reasons why we didn't think

15   arbitration applied.

16        THE COURT:  My comment about refusing to participate

17   in arbitration was not against you or Mr. Peter.  It was that

18   the WBC seemed to be OK with that, and that's all.  I see

19   bending the rules there, as you say you didn't actually file

20   suit but you explained to them that we are not going to do it

21   your way and they didn't seem to take any action there.

22        MR. COHEN:  I am not sure that is true, your Honor.

23   The WBC, without question, wanted us to arbitrate, wanted us to

24   mediate.  They directed us to do so, but we refused to

25   participate for the reasons that I explained.

74JUMASC

1          And Mr. Lenhardt can correct me if I am wrong, but

2     they clearly, to my mind, wanted this to head in that

3     direction.  What happened was, we said, in the utmost good

4     faith, we don't believe arbitration is necessary.  We don't

5     believe mediation is necessary, but we are willing to meet with

6     you and discuss a way out of this.

7          So there was an extraordinary meeting in February in

8     New York with all of the parties -- the president of the WBC

9     was there, the promoters for the parties, the managers for the

10    parties, prior counsel for Mr. Maskaev was there.  That's where

11    the process began, the negotiations that ultimately they walked

12    away from, walking away essentially from their own offer.

13         So there was a process.  We didn't say, we are not

14    arbitrating, we are not mediating and we rushed to court.  We

15    said, let's mediate.  We are not going to call it mediation --

16    not let's mediate, but let's have a meeting and see if we can

17    negotiate something.  And that was done, good faith, on our

18    end.

19         We thought we had a deal.  We thought we had a step

20    aside.  And in the end, because of the Maskaev camp, in large

21    part, if not entirely, it was never able to happen.

22         THE COURT:  Let me ask Mr. Eisenstein a question.

23         Assuming that the auction goes forward or the purse

24    bid goes forward tomorrow, how does that change the position of

25    Mr. Maskaev and Mr. Rappaport in terms of the actual fight?

74JUMASC

1  They don't have any control over it?  They will not be able to

2  select anything?

3          MR. EISENSTEIN:  They won't be able to select --

4  basically what will happen is that the promotional rights,

5  which is a bundle of rights including where it goes, who

6  televises it, what happens with the ancillary stuff like

7  T-shirts and concessions and all of the various rights that are

8  in that bundle go to somebody else for a package price, and

9  that somebody else then controls them entirely and has the

10  ability to deal them off to another layer of third parties who

11  are then in contract with the holder of the promotional rights

12  and can say, hey, I made a deal.  I paid value for the rights

13  to do this.

14          And so that's what I am describing as an array of

15  rights which necessarily happens over the next several months

16  as preparations for the fight go forward.  But the fundamental

17  thing that gets dealt off is the right to control everything

18  about the fight.

19          THE COURT:  Let me ask you this.  Assume that the

20  negotiations had gone well, would Mr. Maskaev and Mr. Rappaport

21  have that right?  Would they be the ones who are calling the

22  shots?

23          MR. EISENSTEIN:  Let me, with due respect to Mr. Cohen

24  say that, during this very period, since April 6 there was a

25  meeting between Dino Duva, who is in Mr. Peter's promotional

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    camp and Mr. Rappaport, and Mr. Duva said, I am going to make

2    an offer but he never did.

3          THE COURT:  Didn't make an offer?

4          MR. EISENSTEIN:  Make an offer to the other that this

5    promoter, one of the promoters involved in the very fight will

6    take on that position of being the promoter for the fight and

7    so will therefore have the control or there will be joint

8    control -- there are a variety of ways that that can be done.

9          There are two promotional entities.  One that is tied

10   to Peter, one that is tied to Maskaev.  Each of them could say,

11   I will be the promoter, and I will pay you a --

12         THE COURT:  Mr. Lenhardt, are you still there?

13         MR. LENHARDT:  Yes.  I'm sorry, your Honor.

14         MR. EISENSTEIN:  The other way that it can be done is

15   cooperatively, they agree to co-promote it.  They have joint

16   control over it.

17         But the aspect of the control -- and I think that I am

18   talking too long -- the answer to your question is, purse bid

19   they lose control entirely.  Negotiation, there is at least the

20   possibility of joint or agreed to control by one or the other

21   in some permutation.

22         MR. COHEN:  Can I comment on that?

23         THE COURT:  So what the parties, Mr. Peter and Mr.

24   Maskaev would lose is the ability to have any control over it?

25   Is Mr. Peter able to work with someone else and cut out the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    possibility of working with Mr. Maskaev?

2           MR. COHEN:  That is the fallacy here.  What Mr.

3    Eisenstein has left unsaid is that Dennis Rappaport is free to

4    make a bid.  He can go to the purse bid tomorrow and put in a

5    bid to control the promotional rights to the fight.  That's

6    what our clients are intending to do and that's what happens in

7    the normal course.

8           As far as this notion of losing control of the bundle

9    of rights that go with promoting a fight, that happens

10   regardless of when the purse bid takes place, and nothing is

11   stopping Mr. Rappaport from participating in the purse bid.

12          I would also add, it is not as if anyone could walk in

13   off the street and make an offer and suddenly you have lost all

14   your rights to some unknown factor.  I couldn't walk in and

15   say, I will pay a million dollars for this fight.  You have to

16   be a registered promoter.  You have to be in a position to put

17   up 10 percent of your offer on the spot, I believe, if not

18   shortly thereafter.

19          So Mr. Rappaport hasn't lost control of anything.  In

20   fact, my understanding is that, more often than not, fights go

21   to purse bid.  As a veteran promoter, Mr. Rappaport knows the

22   process well and has undoubtedly bid and undoubtedly won many

23   bids and is not being deprived of the right to put in a bid.

24          MR. EISENSTEIN:  Nor are the promoters, including Don

25   King on Mr. Peter's side, but that doesn't mean that they are

43

74JUMASC

1  going to win it.  That means that they are going to put in a

2  sealed bid and hope that that bid is competitive with a

3  promoter from Russia, a total stranger to the transaction who

4  decides he wants to bid.  That is the loss of control.

5        Yes, of course, everybody can go in and, indeed, you

6  can go in and register tomorrow and suddenly become a

7  registered promoter.  But because it is a sealed bid process

8  instead of a negotiation process where people are exploring,

9  will you do this or I'll do that, it is a different -- it

10  carries different risks with it.

11        THE COURT:  Let me ask this.  Is there a floor for

12  these sealed bids?

13        MR. COHEN:  My understanding, your Honor, there is not

14  a floor per se, but if the WBC determined that the bids are too

15  low, then it can extend the period for the purse offers and

16  seek additional bids.

17        THE COURT:  There is no minimum, say, it must be at

18  least a million dollars?

19        MR. EISENSTEIN:  No.  There is no knock-down or

20  whatever that thing is called at an art auction where it is

21  withdrawn if it is below that amount.  The only thing is, as

22  Mr. Cohen says, they can extend the process for 15 days,

23  seeking additional sealed bids.

24        MR. COHEN:  Ultimately, Judge, it is market driven, so

25  the bid in that sense is what they are capable of delivering.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74JUMASC

1    There is only so much money that you can get from a venue or

2    from a TV contract, I should say, and so the market tends to

3    dictate, if not in every situation then in just about every

4    situation what the bids are going to be.

5          So, again, I think it underscores, there is no

6    downside.  His concern that Mr. Rappaport doesn't know what a

7    bid is going to be from some third promoter who might outbid

8    him, all that means is that there is more money going into the

9    fighter's pocket.  If some promoter comes in and offers $4

10   million and Mr. Rappaport was only offering 3, that's a

11   win-win.  Everybody has the extra million.  Some of that

12   inevitably gets to the promoters.  So, again, it is hard to see

13   what the harm is here.

14          THE COURT:  I just have an additional question.

15          Who is the promoter for Mr. Peter?

16          MR. COHEN:  Duva Boxing.

17          THE COURT:  Who is that?

18          MR. COHEN:  It is a company out in New Jersey headed

19   by Dino Duva, comes from the Duva family which has a long

20   lineage in the boxing industry.

21          THE COURT:  So it is Duva v. Mr. Rappaport, is that

22   it?

23          MR. EISENSTEIN:  It is actually, Duva and Don King.

24   Don King owns one-half of Duva Productions.

25          THE COURT:  So it is that entity?

74JUMASC

1          MR. COHEN:  Duva Boxing.

2          THE COURT:  Versus Rappaport Productions?

3          MR. EISENSTEIN:  Right.

4          THE COURT:  I don't use the term "versus" in sort of

5    an adversarial way.  If they were to agree, what is it that

6    they would be agreeing on?

7          MR. EISENSTEIN:  How much each of the fighters would

8    get in the way of purses and where the fight would occur, what

9    date and television outlet, HBO, Showtime would present the

10   fight, what the international distribution of the fight would

11   be, what the -- I am blocking the word -- the showing it later

12   rights are, which is a whole separate market.

13         THE COURT:  Rerun?

14         MR. EISENSTEIN:  Rerun type of rights.

15         In addition to everything that goes on at the venue,

16   those are the things that they would be agreeing or could agree

17   on.

18         THE COURT:  Who would be putting up the money?

19         MR. EISENSTEIN:  A lot of the money comes from

20   television.  A lot of the money comes from the site.  And many

21   of these things, although Mr. Cohen is right that it is market

22   driven, it is a funny market because there is a moment in time

23   where there is a television date and HBO is prepared to pay X

24   because they don't have anything else then.  If that doesn't

25   happen then and their dance card is full for three, four months

74JUMASC

1    thereafter, then HBO isn't interested and suddenly there is no

2    competition between HBO and Showtime.  I guess that is market

3    driven, but it is serendipitous.

4         MR. COHEN:  He is exactly right.  There is a moment in

5    time already during this process since Samuel Peter won the

6    first eliminator, since he won the second eliminator and those

7    moments have been disappearing.  We now have the opportunity to

8    have a purse bid tomorrow.  If we extend it another couple of

9    weeks, more is going -- the dates are going, the venues are

10   going.

11        If you look at the hardships, if you even get there --

12   which we don't think you do -- the balance of hardships, they

13   tilt in favor of getting this purse bid done as soon as

14   possible.  The process has just gone on too long at this point.

15   Mr. Peter has been harmed enormously.

16        THE COURT:  I hear what you are saying, but I guess my

17   point is that, if I understand what I have been told, if it

18   goes to purse bid then -- and I am using these terms very

19   grossly -- Mr. Maskaev and Mr. Peter becomes the puppets of

20   someone else who calls all the shots, who tells them this is

21   what you are doing, this is where it is going to be, this is

22   all of this, this is all of that, whereas, if they actually

23   agree, then they are the ones who set that up and then what?

24   Get money from television and things like that?  So they are

25   either going to have to come to an agreement and do it together

47

74JUMASC

1   or they are going to lose the control that seems to be so

2   precious.  Is that correct?

3          MR. COHEN:  It is correct that somebody else will be

4   part of the process, but I think there's a sense that this is

5   somehow extraordinary.  This is how the business works.  Purse

6   bids are common.  It is an entire section of WBC rules devoted

7   to purse bid.

8          THE COURT:  I understand that purse bids are common.

9   My problem is that the timing here is a little extraordinary,

10  in other words, the 10 days and then the 11th day and the purse

11  bid takes place is not necessarily the way it looks like it is

12  going to happen in these rules.

13         MR. COHEN:  My understanding is that it is not

14  extraordinary to have a shortened time period, No. 1, and that

15  is if there is only one item on the list.  I just don't think

16  it is that extraordinary that the time is shortened, nor is it

17  extraordinary to go to purse bid.  It happens all the time.

18         THE COURT:  I don't have a problem with purse bid; it

19  is with the timing of the purse bid that I have a problem.

20         MR. COHEN:  I can't help but come back to the long

21  history of this, that Samuel Peter -- all Samuel Peter did was

22  everything that everybody asked him to do.  He fought the

23  fights he was supposed to.  He paid the fees he was supposed to

24  pay.  He won the fights that he fought.  He contacted the

25  Maskaev camp the day after he won his elimination bout and they

74JUMASC

1    ignored him.

2            So under these circumstance to say 10 days, it is not

3    extraordinary.  They are looking for two more weeks apparently,

4    which is just another 10 business days.  As I say, our

5    understanding is that promoters on their side have essentially

6    ignored the overtures from the Peter camp, haven't negotiated

7    in good faith.  There is nothing to indicate that an additional

8    two weeks puts them in any better position to negotiate in good

9    faith, which they haven't done until now.

10           THE COURT:  Let me take a break, and I will come back

11   and we may resolve this or talk a little further.

12           Counsel, while I am in the process of deliberating on

13   this, I did want to put out a suggestion for you to be mulling

14   over as well.  What would happen if the defendants agreed to a

15   10-day adjournment in return for the plaintiffs agreeing to a

16   45/55 split?

17           Think about it.

18           If you want to pick up the phone and talk to Mr.

19   Lenhardt, don't hesitate.

20           MR. LENHARDT:  Thank you.  I did hear the extension,

21   but it faded in and out.

22           THE COURT:  The other part was that, in exchange for

23   that, the plaintiff would agree to the 45/55 split.

24           (Recess)

25           THE COURT:  A couple of thoughts here which may be

74JUMASC

1    translated into findings, actually.

2            The administrative exclusivity under Section 5.1

3    through 5 of the rules might, in the first instance, be

4    impressive as a basis for the Court not getting involved,

5    however, when the WBC doesn't apply its own rules, that is, the

6    new rule in 2005 that could have solved this problem a long

7    time ago, it seems to me that it is unfair to insist that the

8    plaintiff follow the rules of being precluded from coming into

9    court.

10           Next, it seems to me that this has been going on at

11   least since January.  It is not clear to me why there hasn't

12   been an agreement.  It seems to me that Mr. Maskaev could have

13   been negotiating with Mr. Peter because he knew at some point

14   it was going to happen, and I don't know how soon after Mr.

15   Peter looked like he was going to be the contender that

16   Mr. Klitschko decided that he wanted to come back in.  I assume

17   that Mr. Peter was notified by the WBC first because otherwise

18   you wouldn't have created a problem, or at least I don't think

19   you would have, of having a retired champion returning and then

20   naming somebody else.

21           So it seems to me, taking it at face value, that

22   Mr. Peter has been making overtures to Mr. Maskaev and

23   Mr. Rappaport.  I understand Mr. Eisenstein's argument about

24   control, but when you come right down to it, it is control

25   actually over money, the ability to determine the site, who

50

74JUMASC

1    gets the various contracts.  Yes, it is control, and it would

2    be good control if it could be kept between Mr. Maskaev's team

3    and Mr. Peter's team.

4            However, it just seems to me that I don't see this as

5    any irreparable injury to the plaintiff at this point.  So it

6    doesn't seem to me that there is any basis, because in all

7    probability it would not be successful on the merits either, as

8    I said, considering how everybody here has a reason to be

9    wearing sunglasses in court.  So it seems to me that the

10   appropriate thing to do here is to deny the TRO, and that is

11   what I am doing.  So I am denying the plaintiffs' request for a

12   TRO.

13           I am ordering this record on a daily basis, and please

14   see Ann.  I am splitting the cost of it between the parties.

15           Have a good day.

16                           o    0    o

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300